16898

WILSON v. F. W. WOOLWORTH CO. *ET AL.*

(83 S. E. (2d) 166)

*Messrs. Haynsworth & Haynsworth,* of Greenville, *for Appellant,*

*Messrs. Mann, Arnold & Mann,* of Greenville, *for Respondent,*

July 29, 1954.

MANN, Acting Associate Justice.

Action against F. W. Woolworth Company and Southern Ice Company for damages for personal injuries alleged to have been sustained by Respondent who stepped, or fell, ·into an open manhole situate on the sidewalk on Washington Street, in the City of Greenville, on October 22, 1952.

The complaint cites several separate specifications of negligence all of which are resolved into charges of negligence on the part of Appellants for failure to erect a barricade or do anything to warn the traveling public that the street was blocked by a coal chute which was being used by Appellant Southern Ice Company in making a delivery of coal to the F. W. Woolworth Company by means of an open manhole in the sidewalk flush with the street.

All specifications of negligence were alleged to be joint and several against both Appellants.

In addition to a general denial, Appellant Southern Ice Company pleaded contributory negligence and recklessness on the part of Respondent in failing to keep a proper lookout and in failing to take proper care and caution in the face of the obvious danger of the open manhole.

The case came on to be heard before Honorable J. B. Pruitt, Presiding Judge and a jury. A timely motion for directed verdict was made by the Defendant Woolworth Company and was granted.

The case against Appellant Southern Ice Company was submitted to the jury, resulting in a verdict in favor of the Respondent for $1,000.00 actual, and $500.00 punitive damages.

Timely motion was made for a new trial or Judgment for Appellant notwithstanding the verdict, which was duly heard and overruled.

The exceptions are really two in number. The first charges error on the part of the Presiding Judge in failing to direct a verdict for Appellant (a) on the ground that there was no negligence on the part of the Appellant operating as a proximate cause, or (b) that the Presiding Judge committed error in failing to find as a matter of law that Respondent was guilty of contributory negligence such as would bar any right of recovery.

The second exception charges error on the part of the Presiding Judge in submitting certain requests to charge to the jury. Under our view of the case, it will be necessary to consider only the issue of contributory negligence presented by the first exception.

At the time of the accident, Respondent was a man of 76 years of age, with vision somewhat impaired in his right eye due to the presence of a cataract. He was walking East on the North side of West Washington Street toward Main Street which was only about 30 feet away. He had just visited his dentist in a nearby building on Washington Street and was approaching the intersection of Main and Washington Streets with a view of crossing Main Street and catching a bus home. It was a perfectly clear day and around two-thirty or three o'clock in the afternoon. A truck loaded with furnace or stoker coal for delivery to the Woolworth Company was parked by the sidewalk curb and opposite the manhole in controversy. The chute, around 15 feet or more in length, was erected and in position for delivery of the coal into the manhole. As erected, the chute created a clearly visible open, patent and obvious obstruction of the sidewalk from the curb up to the immediate vicinity of the edge of the manhole. The time required for delivery covered only a few minutes, around five minutes as a possible minimum, or thereabouts. Pedestrians using that blocked portion of the sidewalk either passed around by going out into the unobstructed street, or stepped over the chute. The manhole was open and delivery of the coal had been begun when something went wrong with the mechanism and the conveyor belt that carried the coal from the truck to the chute refused to work. Two Negro men, Will Ashmore and Charlie Rickard, were sitting squatted at the end of the chute near the manhole, working on the chute to get it back in motion. A third man, Sam Shoemaker, was standing nearby. Will Ashmore was facing toward Main Street and had his back toward Respondent who was approaching. Rickard was on the opposite side, with his front turned

toward the direction from which Respondent was approaching. Some loose coal was lying on the sidewalk in the immediate vicinity of the chute. No barricade was erected on either side of the chute nor were any additional signs placed thereabouts, nor was any person assigned the duty of giving additional warnings to pedestrians.

The manhole into which Respondent fell is on the North side of Washington Street and about 30 feet from the intersection of Washington and Main Streets, and was flush with the surface of the sidewalk. Quoting from Respondent's Brief, "the intersection of Main Street and Washington Street is the principal intersection in the City of Greenville, S. C., and is, therefore, very heavily traveled both by vehicles and pedestrians". The manhole has a metal top and is about 23 inches in diameter and on the side nearest the wall is six or eight inches from the wall of the Woolworth Building.

Three photographic representations, showing the set up of the truck, the chute and the manhole, from many different approaches and used in the trial of the case, were supplied this Court on argument and were of valuable assistance in giving the Court a clearer conception of the situation existing at the time of the accident.

Although placed there under authority granted by the City of Greenville, the manhole is used solely by Woolworth Company for the purpose of effecting delivery of its furnace fuel into the basement below. So far as the records show, there is no other practical means by which the Woolworth Company could have its coal delivered into its basement.

It is in evidence also that there are numerous other similar manholes in different parts of the City used for similar purposes and the delivery and unloading of coal in this manner is a matter of common practice and within common knowledge over a period of many years. The particular manhole in question has been in continuous use in the same manner as it was being used on the date in question for about twelve years and deliveries were made at from eight to a dozen times a year.

Delivery of coal into the basement of the Woolworth Building is effected by the use of the truck, the chute and the manhole. The truck is of metal body and is equipped with a device which moves the coal from an opening at the lower rear and deposits it into the chute, which by the aid of the conveyor device deposits it into the manhole. The chute is of metal construction and measures three or four inches in depth and 18 inches in width. At the point where the chute is attached to the truck it is about three feet high. At the lower end where it delivers the coal into the manhole it lies on the sidewalk. Thus it will readily be seen that beginning at a height of about three feet at the truck, and descending at an angle downward the chute becomes a perfectly obvious, patent and visible obstruction to pedestrian traffic on the entire sidewalk less the width of the manhole itself, plus the few inches between the manhole and the wall of the Woolworth Building.

The manhole does not descend perpendicularly, but within about three or four inches of the top, or opening, bears off at an angle toward the cellar under the Woolworth Building. The testimony shows that near this bearing off, is an iron obstruction across the opening which would prevent the body of a man from falling through. The testimony is conclusive that one stepping in as the Respondent did could scarcely go down farther than the knees.

Notwithstanding his advanced years, and some impairment of his vision in the right eye due to the presence of a cataract, Respondent was in apparent good physical condition for a man of his years. Even with the impaired vision, he seemed in possession of all facilities requisite to his getting around and pursuing a somewhat busy life. His habit of locomotion was that of a man of younger years. He emphasizes that his *"usual gait is a little faster than the ordinary walk"* and that on this occasion he *"certainly was not trailing along."* (Emphasis ours.) He is a man of excellent social, educational and business background. In fact, his life has been commendably busy and rather varied and

doubtless interesting. Having moved from his native County of Abbeville about 1902, to Greenville, he seems to have been active in many of the social, cultural and governmental affairs of the City. For four years, 1923-1927, he was member of the City Council and Chairman of the Building Program. He organized the local chapter of Boy Scouts and the Civitan Club. He was Vice President of the Chamber of Commerce and President of the Upper South Carolina Historical Society. In 1934 he went to the City of Washington where he held a position in the office of Judge Advocate where his responsible duties consisted of the adjustment of claims for the Government. His work continued up to and until the change of administrations two years ago, at which time he came back to Greenville and has been making his home there since.

While working for the Government in Washington, Respondent's office was in the Archives Building which is situated near the intersection of 7th Street and Pennsylvania Avenue. He traveled to and from his place of business, sometimes by bus and sometimes by street car. Naturally, it was necessary for Respondent in boarding his vehicle of travel to negotiate some portions of the heavily traveled portions of the City of Washington in which he worked. It is a matter of notorious knowledge the country over that traffic thereabouts is heavy. Thousands of employees hurrying to and fro, countless busses, cabs and cars dashing in all directions, and apparent peril always facing the pedestrian, made it imperative that one needling his way through these confused surroundings must be possessed of capable seeing and hearing facilities and always be exercising a high degree of caution. It all constituted an excellent schooling for pedestrians in busy centers, especially like the one at the intersection of Washington and Main Streets in Greenville, which in turn is one of the very busiest in the entire state of South Carolina.

Respondent had come into that portion of the City to visit his dentist in the Wallace Building about 100 feet

away on Washington Street. He "got off in front of the Poinsett", walked up Main Street several blocks to Washington, down West Washington to the Wallace Building. Coming out of the Wallace Building, he re-entered West Washington, and was walking eastward on the North side of Washington toward the intersection of Washington and Main, only about 30 feet away, "with the idea of crossing Main and picking up a bus in front of Payne's store to go" to his home. He was walking without the aid of a cane, which he sometimes uses "nearly to the wall of the building rather than to the outside of the curb." Asked by his counsel how he was walking, "fast or slow", he replied, *"I presume I would be walking at my usual gait which is perhaps a little faster than the ordinary walk. I certainly was not trailing along."* (Emphasis ours.)

A brief excerpt from the record best describes what really happened.

"Q. What happened to you then? A. Hah! All I know is the earth seemed to open under my feet and I fell, went down.

Q. Before we get into that, did you notice any coal truck standing out in the street? A. No, sir. If there was one there, I didn't see it.

Q. Did you notice anything on the sidewalk about where you fell? A. I cannot say I saw anything whatsoever except some coal scattered over the sidewalk.

Q. Did you see any hole in the sidewalk? A. No, sir.

Q. Did you actually see the coal chute that led from the truck to the coal opening. To the hole? A. I have no recollection whatsoever of seeing it, Sir. * * * I have no remembrance of seeing a coal truck.

Q. Did you see the open hole in which you fell? A. No, sir. I saw no hole. Nothing but black coal on the sidewalk.

Q. When you saw that black coal on the sidewalk, did you change your course any? A. I veered slightly to the left.

Q. And then it happened? A. Then it happened.

* * *

"Q. Was there anything around that hole, barricades of any kind? A. None whatever, sir. Nothing.

Q. Tell the jury what, if anything was there to warn you about the hole? A. Well, there was nobody there at all. The cause of my veering slightly to the left was because of the quantity of coal on the sidewalk and I had a pair of new shoes and didn't want to get them messed up is the truth of it."

On cross examination by Mr. Price. * * * "Q. Anyway, now, did you see anything there on the sidewalk to prevent you from seeing a great big coal truck loaded with coal drawn up to the curb? A. Mr. Price, I was not looking toward what was passing or what was standing still in the street. I had my eye and was expecting to go straight forward about my business."

Re-examined and cross-examined, Respondent continously and consistently affirmed that he did not see the truck, did not see the chute, did not see the hole, did not see the two men sitting near the manhole bending over the lower end of the chute, and did not see anything whatsoever on the sidewalk but some loose coal which he attempted to avoid to keep from scratching his shoes and knew nothing about the presence of any obstruction of any kind on the street and the falling into the hole was the first knowledge he had of the presence of the open manhole.

Hence, it seems incredible that one of Respondent's intelligence, alertness and long years of experience in the exacting art of making his way through vast and moving crowds, on busy crowded streets and sidewalks and effecting crossings at the busy, heavily traveled intersections in one of the very busiest cities of the world should so forget himself and so neglect his safety while traveling on a well known busy street, very near the busiest intersection in his home City, and one of the busiest in the entire State, in the clear light of day, as to walk so briskly and carelessly along as not to see directly across his path of travel a large black coal chute with two large full grown men squatted directly at

his feet, and a large black manhole open before him gaping its black warning of its dangerous presence.

There can be no other reasonable conclusion than that Respondent was hurrying along, keeping no lookout nor exercising any degree of care or caution for his own safety, and that conduct constituted gross and wanton negligence on his part and was the direct and proximate cause of his injury, without which his injury would not have happened.

We are not unmindful of the somewhat diminished vision in his right eye. But when we keep in mind that the same vision has steered him safely across busy streets in Washington for years and has been of sufficient strength to safeguard his movements and save him harmless all these busy and crowded years, we can only conclude that on this occasion he was not using his vision nor his other capable faculties to safeguard his interests in the least degree.

If upon any consideration it might be ascertained that Appellant was guilty of negligence in any of the specifications set forth, the pursuit of such inquiry in the light of the conclusions herein expressed would be of no avail.

We have considered carefully the cited cases of Respondent; *Rowland v. Town of Dillon,* 188 S. C. 408; 199 S. E. 525; *Humphries v. Union & Glenn Springs R. Co.,* 84 S. C. 202; 65 S. E. 1051; *Kennedy v. City of Greenville,* 78 S. C. 124; 58 S. E. 989; and other cited cases.

Insofar as they are considered as applicable to this case, in substance, they only recite that even though one knows of the defect in the street, such mere knowledge does not make the traveler guilty of negligence, unless the defect is of such a nature or danger so obvious that a person of ordinary prudence would not have used it.

Here we have a defect that is so obviously patent, open and dangerous that had the Respondent exercised any care whatsoever, he would not have suffered any injuries, and we cannot escape the conclusion that his carelessness

amounted to sheer wantonness and recklessness and contributed as a proximate cause to his injuries.

For the reasons heretofore assigned, it was error for the Presiding Judge not to direct a verdict for the Appellant, Southern Ice Company, notwithstanding the verdict.

Judgment is reversed and the case remanded with instructions to enter up Judgment for the Appellant, Southern Ice Company under Rule 27 of this Court.

STUKES, TAYLOR, OXNER, and LEGGE, JJ., concur.